UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

| | |
|---|---|
| GRAPHIC COMMUNICATIONS LOCAL 1B HEALTH & WELFARE FUND "A"; and THE TWIN CITIES BAKERY DRIVERS HEALTH AND WELFARE FUND, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>CVS CAREMARK CORPORATION; CVS PHARMACY, INC.; CAREMARK, LLC; CAREMARK MINNESOTA SPECIALTY PHARMACY, LLC; CAREMARK MINNESOTA SPECIALTY PHARMACY HOLDING, LLC; COBORN'S, INCORPORATED; KMART HOLDING CORPORATION; SEARS, ROEBUCK AND CO.; SEARS HOLDINGS CORPORATION; SNYDER'S DRUG STORES (2009), INC.; SNYDER'S HOLDINGS (2009), INC.; SNYDER'S HOLDINGS, INC.; TARGET CORPORATION; WALGREEN CO.; and WAL-MART STORES, INC.,<br><br>      Defendants. | Civil Action No. 0:09-cv-02203-JMR-FLN |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

### INTRODUCTION

    1.    Generic prescription drugs generally cost less—often much less—for pharmacies to purchase from drug manufacturers and wholesalers than otherwise equivalent brand-name prescription drugs. Minnesota law requires that pharmacies pass on the **entire** amount of this savings to purchasers of generic drugs. The Defendant pharmacies, however, routinely violate this law and instead see the lower acquisition cost of generic drugs as an opportunity to generate

higher profits for themselves. The Defendants' pricing practices have resulted in overcharges to Minnesota businesses, consumers, and families and further drive up already escalating medical costs. Plaintiffs are bringing this action on behalf of a class of Minnesota generic prescription drug purchasers to recover these overcharges and bring the Defendants into compliance with Minnesota's generic drug pricing laws.

2.      Plaintiffs have filed this First Amended Complaint to avoid any confusion or mischaracterization of this action. Plaintiffs do not allege in this Complaint that the Defendants unlawfully priced generic prescription drugs dispensed through the Medicaid or Medicare programs, nor do they seek any relief in this action concerning the Medicaid or Medicare programs and/or payments made for generic prescription drugs thereunder.

### PARTIES, JURISDICTION, AND VENUE

3.      Plaintiffs, Graphic Communications Local 1B Health & Welfare Fund "A" ("Local 1B") and The Twin Cities Bakery Drivers Health and Welfare Fund ("TCBD"), are jointly administered Taft-Hartley Funds, authorized pursuant to Section 302(c)(5) of the National Relations Act, and are employee welfare benefit plans as defined in Section 3(1) of the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiffs provide health benefits, including prescription drug benefits, to its approximately 2,600 active participants, plus their spouses and dependents. Plaintiffs are legal entities entitled to bring suit in their own names pursuant to 29 U.S.C. § 1132(d).

4.      Local 1B's principal place of business, from which it pays medical benefits, including benefits for prescription drugs, is located in St. Paul, Minnesota.

5.      TCBD's principal place of business, from which it pays medical benefits, including benefits for prescription drugs, is located in Eagan, Minnesota.

6.   Plaintiffs' participants, including their spouses and dependents, are residents of several counties within the state of Minnesota.

7.   Plaintiffs' health and medical benefits are provided under written benefit plans. Such plans contain certain subrogation provisions under which Plaintiffs are subrogated to and assigned all rights and causes of action of their participants and beneficiaries for whom they pay benefits. Many of Plaintiffs' participants and beneficiaries were purchasers of generic prescription drugs and are part of the class described below. Plaintiffs have paid and/or reimbursed its participants and beneficiaries for purchases of generic prescription drugs.

8.   Defendant CVS Caremark Corporation is a Rhode Island corporation.

9.   Defendant CVS Pharmacy, Inc., is a Rhode Island corporation licensed to do business and doing business in Minnesota.

10.   Defendant Caremark, LLC, is a California limited liability company licensed to do business and doing business in Minnesota.

11.   Defendant Caremark Minnesota Specialty Pharmacy, LLC, is a Minnesota limited liability company.

12.   Defendant Caremark Minnesota Specialty Pharmacy Holding, LLC, is a Minnesota limited liability company.

13.   CVS Caremark Corporation; CVS Pharmacy Inc.; Caremark, LLC; Caremark Minnesota Specialty Pharmacy, LLC; and/or Caremark Minnesota Specialty Pharmacy Holding, LLC (collectively, "CVS"), own and operate approximately 35 retail pharmacies in Minnesota and employ pharmacists at each such store.

14.   Defendant Coborn's Incorporated ("Coborn's"), is a Minnesota corporation.

15. Coborn's owns and operates approximately 26 retail pharmacies in Minnesota and employs pharmacists at each such store.

16. Defendant Kmart Holding Corporation is a Delaware corporation.

17. Kmart Holding Corporation is a wholly-owned subsidiary of Sears Holdings Corporation, a Delaware corporation.

18. Defendant Sears, Roebuck and Co. is a New York corporation licensed to do business and doing business in Minnesota.

19. Kmart Holding Corporation; Sears, Roebuck and Co.; and/or Sears Holdings Corporation (collectively, "Kmart") own and operate approximately 32 retail pharmacies in Minnesota and employ pharmacists at each such store.

20. Defendant Snyder's Drug Stores (2009) Inc., is a Minnesota corporation.

21. Defendant Snyder's Holdings (2009), Inc., is a Minnesota corporation.

22. Defendant Snyder's Holdings, Inc., is a Minnesota corporation.

23. Snyder's Drug Stores (2009), Inc.; Snyder's Holdings (2009), Inc.; and/or Snyder's Holdings, Inc. (collectively "Snyder's"), own and operate approximately 34 retail pharmacies in Minnesota and employ pharmacists at each such store.

24. Defendant Target Corporation ("Target") is a Minnesota corporation.

25. Target owns and operates approximately 71 retail pharmacies in Minnesota and employ pharmacists at each such store.

26. Defendant Walgreen Co. ("Walgreens") is an Illinois corporation licensed to do business and doing business in Minnesota.

27. Walgreens owns and operates approximately 117 retail pharmacies in Minnesota and employ pharmacists at each such store.

28. Defendant Wal-Mart Stores, Inc. ("Wal-Mart"), is a Delaware corporation licensed to do business and doing business in Minnesota.

29. Wal-Mart owns and operates approximately 69 retail pharmacies in Minnesota and employ pharmacists at each such store.

## JURISDICTION AND VENUE

30. The Fourth Judicial District, county of Hennepin, state of Minnesota, had subject matter jurisdiction over Plaintiffs' original Complaint pursuant to Minn. Stat. § 484.01.

31. Venue was appropriate in the Hennepin County District Court pursuant to Minn. Stat. § 542.09.

32. The Hennepin County District Court had personal jurisdiction over Defendants.

33. Defendants removed this matter to this Court on August 21, 2009, alleging federal subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332, and 1453.

## FACTUAL BACKGROUND

34. In 2007 total retail sales for prescription drugs filled at Minnesota pharmacies exceeded $3.2 billion. Almost 53 million retail prescriptions were filled at Minnesota pharmacies in 2007. Kaiser Family Foundation Report, **Ex. 1**.

35. Generic drugs account for approximately 70 percent of all prescription drug purchases in the United States. United States Food & Drug Administration Web Site, **Ex. 2**.

**Minnesota Law Requires Pharmacies to Pass on the Savings Realized Through the Reduced Acquisition Cost of Generics.**

36. Pharmaceutical companies develop new drugs under patent protection. The patent protects the company's investment in the drug's development—including research, development, marketing, and promotion—by giving the company the sole right to sell the drug while the patent is in effect. *Id.*

5

37. When the patent expires, other drug manufacturers may obtain government approval to manufacture and sell generic versions of the drug. A generic drug is identical, or bioequivalent, to a brand-name drug in dosage, form, safety, strength, route of administration, quality, performance, characteristics, and intended use. *Id.*

38. Although generic drugs are chemically identical to their branded counterparts, they are sold at substantial discounts from the branded price, in part because the generic manufacturer is not required to repeat costly animal and clinical research on ingredients or dosage forms already approved for safety and effectiveness. *Id.*

39. To encourage the cost savings realized through the sale of generic prescription drugs, Minnesota law requires pharmacists to fill a prescription with a therapeutically equivalent generic drug in most circumstances. Minn. Stat. § 151.21, subd. 3.

40. Minnesota's generic drug law also requires pharmacies to pass on to purchasers the cost savings realized by the pharmacies' lower acquisition cost of generic drugs. Specifically, the statute requires:

> A pharmacist dispensing a drug under the provisions of subdivision 3 shall not dispense a drug of a higher retail price than that of the brand name drug prescribed. If more than one safely interchangeable generic drug is available in a pharmacist's stock, then the pharmacist shall dispense the least expensive alternative. **Any difference between acquisition cost to the pharmacist of the** drug dispensed and the brand name drug prescribed shall be passed on to the purchaser.

Minn. Stat. § 151.21, subd. 4 (emphasis added).

41. As a result, a pharmacy in Minnesota cannot make a greater profit on the sale of a generic prescription drug than it does on the brand-name version of the drug.

42. The maximum price for a generic drug under Minn. Stat. § 151.21, subd. 4, can be calculated as follows:

**Generic price – Generic acquisition cost ≤ Brand price – Brand acquisition cost**

6

Or, in more simplified terms:

**Generic sales price ≤ Brand profit + Generic acquisition cost**

### Several of the Defendants Admit to Making a Greater Profit on Generic Drugs than on Their Brand-Name Counterparts.

43. In its 2007 annual report, CVS represented the following:

   a. "Gross margins increased in both our retail and PBM businesses, due largely to significant generic drug introductions . . . ." (p. 7.)

   b. "[G]enerics are more profitable than brand name drugs and help drive margin expansion." (p. 8.)

   c. "[W]e continue to benefit from the increased utilization of generic drugs (which normally yield a higher gross profit rate than equivalent brand name drugs) in both the Retail Pharmacy and Pharmacy Services segments. During 2006, gross profit increased $2.0 billion primarily due to increased utilization of generic drugs in both the Retail Pharmacy and Pharmacy Services segments." (p. 20.)

   d. "Our net revenues are reduced as generic dispensing rates increase, however, our gross profit and gross profit margins generally increase with the corresponding increase in generic dispensing rates since generic drug revenues normally yield a higher gross profit rate than equivalent brand name drug revenues." (p. 26.)

   e. "As previously discussed, our net revenues are reduced as generic dispensing rates increase, however, our gross profit and gross margin rates generally increase with the corresponding increase in generic dispensing rates." (p. 27.)

*See* CVS 2007 Annual Report, **Ex. 3**.

44. In its 2008 annual report, CVS stated the following:

   a. "Total revenues rose 14.6 percent to $87.5 billion. Driven in part by record operating margins, net earnings increased 21.8 percent. A number of factors fueled our margin gains, with continued growth in generic drugs leading the way." (p. 6.)

   b. "In addition, our gross profit continued to benefit from the increased utilization of generic drugs (which normally yield a higher gross profit rate than equivalent brand name drugs) . . . ." (p. 21.)

   c. "During 2008, our pharmacy gross profit rate continued to benefit from an increase in generic drug revenues, which normally yield a higher gross profit rate than equivalent brand name drug revenues. However, the increased use of generic drugs has augmented the efforts of third party payors to reduce reimbursement payments to retail pharmacies for prescriptions. This trend, which we expect to continue, reduces the benefit we realize from brand to generic product conversions."

*See* CVS 2008 Annual Report, **Ex. 4**.

45. In a *Wall Street Journal* article dated March 13, 2007, a CVS spokesperson admitted that CVS generally makes more money on generic prescription drugs than on brand name prescription drugs.  "Mr. DeAngelis [CVS spokesperson] wouldn't say how much CVS pays for generics but confirmed profit margins on generics are generally bigger than for branded drugs." *See Wall Street Journal*, March 13, 2007, **Ex. 5**.

46. Walgreens stated in its 2008 annual report as follows:

> a. "Gross margin as a percent of sales decreased to 28.2% in 2008 from 28.4% in 2007. . . . This was partially offset by an improvement in retail pharmacy margins, which were positively influenced by generic drug sales . . . ."  (p. 19.)
>
> b. "Retail pharmacy margins increased as a result of growth in generic drug sales."  (p. 19.)

*See* Walgreen's 2008 Annual Report, **Ex. 6**.

47. In a *Wall Street Journal* article from March 13, 2007, a Walgreens spokesperson acknowledged that Walgreens generally makes a greater profit on generic prescription drugs than on brand name prescription drugs.  "She [Walgreens spokesperson Tiffani Bruce] also says profit margins on generics help the pharmacy chain make up for much smaller profits—or even losses—on branded drugs.  The beginning of a generic's availability 'represents a small window where drug stores are able to recover from the weight of carrying all these unprofitable prescriptions,' Ms. Bruce says." *See* March 13, 2007, *Wall Street Journal*, **Ex. 5**.

**Plaintiffs Have Been Harmed by Defendants' Violations of Minnesota's Generic Drug Pricing Laws.**

48. Plaintiffs have either directly purchased generic prescription drugs or are the payment source for generic prescription drugs dispensed by one or more of the Defendants.

49. Upon information and belief, on one or more occasions the Defendants have failed to pass on to Plaintiffs the difference between the acquisition cost to the pharmacy of the

generic drug dispensed and the brand name prescribed in violation of Minn. Stat. § 151.21, subd. 4.

50. Plaintiffs have been directly harmed by Defendants' unlawful conduct as alleged herein.

### Class Action Allegations

51. Plaintiffs bring this action both individually and as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and all others similarly situated. Plaintiffs hereby request that this Court certify this matter as a class action as the Court deems appropriate and defined as follows:

> All purchasers or payment sources for generic prescription drugs dispensed by the Defendants in the state of Minnesota on or after July 28, 2003, excepting those dispensed through the Medicaid or Medicare programs. Excluded from the class are members of the judiciary, Defendants' employees, officers, directors, subsidiaries, and affiliates, and jurors in this matter.

52. The prerequisites of Fed. R. Civ. P. 23(a) are satisfied as follows:

   a. The class is so numerous that joinder of all members is impracticable.

   b. There are questions of law or fact common to the class.

   c. The claims or defenses of the representative parties are typical of the claims or defenses of the class.

   d. The representative parties will fairly and adequately protect the interests of the class.

53. Fed. R. Civ. P. 23(b) is satisfied as follows:

   a. Prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

   b. Prosecuting separate actions by individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interest of the other members not parties to the individual actions or would substantially impair or impede their ability to protect their interests.

   c. The party opposing the class has acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

      d.    Questions of law or fact common to the members of the class predominate over any questions affecting only individual class members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

### COUNT I: VIOLATION OF MINNESOTA GENERIC DRUG PRICING LAW

54.    Plaintiffs restate their allegations in paragraphs 1 through 53 as though set forth here in their entirety.

55.    Defendants and their employees are subject to Minn. Stat. § 151.21, subd. 4, when selling generic prescription drugs in the state of Minnesota.

56.    Plaintiffs are purchasers and/or payment sources for generic prescription drugs dispensed by Defendants in the state of Minnesota.

57.    On one or more occasions, Defendants have failed to pass on to the purchaser and/or payment source the difference between the acquisition cost of the generic drug dispensed and the brand-name drug.

58.    By failing to pass on the difference between the acquisition cost of the generic drug dispensed and the brand-name drug, Defendants have violated Minn. Stat. § 151.21, subd. 4.

59.    Plaintiffs have been damaged as a result.

### COUNT II: VIOLATION OF MINNESOTA CONSUMER FRAUD ACT

60.    Plaintiffs restate their allegations in paragraphs 1 through 59 as though set forth here in their entirety.

61.    By their conduct alleged above, including their failure to pass on the difference between the acquisition cost of the generic drug dispensed and the brand name as prescribed as required by Minn. Stat. § 151.21, subd. 4, as well as their concealment of that conduct, Defendants engaged in fraudulent, misleading, or deceptive practices in violation of Minn. Stat. § 325F.69, subd. 1.

62.     Defendants intended that others would rely on such fraudulent, misleading, or deceptive practices in connection with the sale of merchandise: namely, generic prescription drugs.

63.     Plaintiffs have been damaged by Defendants' engagement in unfair or deceptive acts or practices and seek relief individually and on behalf of the defined class, pursuant to Minn. Stat. § 8.31, subd. 3a.

### COUNT III: UNJUST ENRICHMENT

64.     Plaintiffs restate their allegations in paragraphs 1 through 63 as though set forth here in their entirety.

65.     By failing to pass on to Plaintiffs the difference between the acquisition cost of the generic drug dispensed and the brand-name drug prescribed in violation of Minn. Stat. § 151.21, subd. 4, Defendants received and retained money which in justice and equity belongs to Plaintiffs and money on which Defendants had no valid claim.

66.     Because Defendants have retained this money, Defendants were unjustly enriched.

67.     Plaintiffs have been damaged as a result.

### JURY DEMAND

68.     Plaintiffs request a trial by jury.

### RELIEF SOUGHT

On their own behalves and on behalf of the proposed class, Plaintiffs seek:

A.      Certification of the proposed class described above, with Plaintiffs to serve as class representatives and the undersigned attorneys to serve as class counsel.

B. Compensatory and actual damages, including, but not limited to, the aggregate amount of the difference between the acquisition cost of the generic drug dispensed and the brand-name drug prescribed that Defendants have failed to pass on to Plaintiffs in violation of Minn. Stat. § 151.21, subd. 4.

C. Restitution and the imposition of a constructive trust of all funds obtained by Defendants as a result of their violation of Minn. Stat. § 151.21, subd. 4.

D. All relief available under the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.69, and the Minnesota Private Attorney General Statute, Minn. Stat. § 8.31, subd. 3a.

E. All available pre- and post-judgment interest.

F. Declaratory and injunctive relief directing Defendants to cease their unlawful conduct.

G. Attorneys' fees and costs.

H. Any other relief which is just and appropriate.

Date: August 28, 2009   FELHABER, LARSON, FENLON & VOGT, P.A.

By:   s/ David L. Hashmall
    David L. Hashmall (#138162)
220 South Sixth Street, Suite 2200
Minneapolis, Minnesota 55402
Telephone: 612-339-6321
Facsimile:  612-338-0535

and

Perrin Rynders
Bryan R. Walters
Varnum LLP
Bridgewater Place, P.O. Box 352
Grand Rapids, Michigan 49501-0352
616-336-6000

**ATTORNEYS FOR PLAINTIFFS**

2853761_1.DOCX